Page number 13, Excerpt 2-6-6, Charlotte Payne et al. v. Novartis Pharmaceuticals Corporation Now we'd like to reserve five minutes for rebuttal please. Very well. My name is Clint Kelly. I'm from the Nashville Bar. I represent Charlotte and Brent Payne in this pharmaceutical liability action. We respectfully request that this court vacate the summary judgment for one basic reason. That the proof in this case, when viewed in the light most favorable to the plaintiffs, shows that if the manufacturer had given an adequate warning, a timely warning, that the physician and the patient would have changed their behavior based on that warning. And as a result, a material issue of fact would have been created with regard to causation. On page 7 of my brief, your honor, I have laid out as best I can a diagram of the alternative chains of causation. Two chains. The first chain is what did happen, which in this case was Novartis did not warn about the dangerous side effect known as ONJ, which led to Dr. Johnson, the prescribing physician, not knowing about that dangerous side effect. Which led to Dr. Johnson not telling Ms. Payne about that dangerous side effect, which led to Ms. Payne taking the drugs, which then led to Ms. Payne developing the injury. That's what did happen. Here's what should have happened. Novartis should have given a warning about ONJ in a timely manner. Should have given that warning to the prescribing physician, Dr. Johnson. With knowledge of that warning, he would have passed that warning on to Ms. Payne. Ms. Payne then would know about that warning and based on her testimony would have refused to take that drug. And if she refuses to take the drug, and this is the critical fact in the case, if she refuses to take the drug, she is not injured. Now you don't have any dates by these events in your chain of what should have occurred according to you. When should these things have happened? According to the evidence, by 2003, the warning was known to Novartis. Actually, they knew earlier than that, but we claim that by 2003, Novartis should have warned Dr. Johnson and other physicians about the risk of ONJ. Is that because prior to 2003, Novartis didn't know about this problem? Novartis knew about this problem, Judge, in the 90s. They've known about this problem for years. They withheld this information. In 2003, there was a conference in which they were told about the risk of ONJ. And they withheld that information until 2004 when they sent a Dear Doctor letter out to other physicians to notify and apprise those physicians that there was an association between the risk of ONJ and the drug Zometa. The point is, Your Honor, even the court has acknowledged for the purposes of summary judgment, there's no dispute that the warning was inadequate. The only dispute here is would an adequate warning have made a difference in the outcome? That's where the district court got hung up. In fact, the district court's order is very simple. The district court's order says the plaintiff has no evidence to show that an adequate warning would have changed the outcome. That is the nub of the case because in this particular case, we did have evidence that a warning would change the outcome simply because Ms. Payne testified by affidavit she would not have taken the drug. And Dr. Kraut, the oral maxillofacial surgeon in this case, has testified that the drug caused the ONJ. Those were the facts in light most favorable to the plaintiff that the court was supposed to take into account. Our position is, Your Honor, that the benefit of the doubt which was supposed to go to the plaintiff in this case went to Novartis on numerous occasions. First, the court said that Ms. Payne's testimony was speculative. First of all, that is at odds with numerous cases, not only the cases in the MDL, which by the way, Your Honor, that's the road map we follow. Judge Campbell's decision, time after time after time, said that the warning, if it changes the behavior of the prescribing physician and the patient, such that the patient would refuse to take the drugs, that is enough to overcome summary judgment. But here, the physician's practice did not change. He became aware of the side effects and continued to prescribe it. He was aware of the side effects during the time your client was taking the medication. Is that right? Actually, Your Honor, he was not. That is another fact issue. I respectfully disagree with you there. In this case, Dr. Johnson testified at about the time when he noticed the injury to Ms. Payne's dental area. In other words, where the ONJ was manifesting itself. That's at the same time when the information was coming out that Novartis' drug causes ONJ. And he continues to prescribe it. The change in behavior, Your Honor, is the warning. That's what differed here. Not only the warning, he also testified, I now have my patients undergo a dental monitoring procedure, which I didn't do before this. So two things changed after the warning. A, he requires dental monitoring for all of his patients who he's going to put on iridiazumab. B, he warns them about ONJ. He couldn't have warned them, Your Honor, about a side effect he didn't know about. But the doctor didn't do that pursuant to any warning by Novartis. Is that right? He had heard somewhere that there might be a problem and it's not clear where he heard that from or how authoritative the source was? He testified, Your Honor, he heard it at seminars and he had heard about it in lectures. That was about as clear as he got about it. But the point is he had to find out through another means rather than the way he should have found out, which was from Novartis, through either a dear doctor letter or through the package insert. Don't forget, Your Honor, the package insert about this drug did not list ONJ as a side effect until after Ms. Payne had gotten her injury. That's the gist of the inadequate warning claim. But he began to hear around, what's it, 2004 or thereabouts? Around the time when she was injured. He said, quote, at about that time, that was his testimony, that's when data, he used the word data, started coming out about the fact that ONJ was a side effect or a potential injury associated with the use of the drugs. The district court in this case assumed he must have known about this before she developed the injury. That's what he inferred. He gave that benefit of the doubt to Novartis. Our position is... Would you repeat that one more time? Sure. The district court... About his assumption? The district court read Dr. Johnson's testimony to mean that he knew, even before Ms. Payne was injured, that ONJ was a side effect of this drug. And in essence, what the district court's thinking was, if he knew about it and still let her keep taking the drug, then under Tennessee law, the learned intermediary doctor would borrow the claim. That was the way the court looked at it. But Dr. Johnson did not testify to that. Dr. Johnson said at about the same time he noticed the injury, this is when the data starts coming out about the side effect of ONJ. And he said, when I found out about this, I changed my prescribing practice. That's the change, Your Honor, that occurred in this case. Where we contend the district court erred, or got hung up here. He got hung up on the fact that Dr. Johnson continues to prescribe the drug. Therefore, the learned intermediary doctor, in essence, borrows the claim. Every case that I've cited in this, from this litigation, from this MDL, even the Sheffer case from the Southern District of Ohio, even the Pfizer case, Smith v. Pfizer, from the Middle District of Tennessee. In each of those cases, the doctors continued to prescribe the drugs, said they would have still prescribed the drugs. But the prescribing practice changed in that they start giving warnings when they find out about the side effect. That's the change. It got lost on Novartis, and it got lost on the district court. But it wasn't lost on all these other courts, including the MDL court, which recognized you can still prescribe a drug. But if you start changing your practice in the way you prescribe it, that is enough to get past learned intermediary doctrine. So what needs to be tried? The issue whether your client's allegation that he or she would not have taken the drug if the doctor had given her the warning? Precisely, Your Honor. That is the credibility determination. That's for the jury. It was not for the district court. That's exactly it. I'd like to revisit one case from the Middle District of Tennessee, which I think has a lot of similarity here to this case, which is Smith v. Pfizer. And the district court, Judge Trauger in that case, revisited some Tennessee law about the learned intermediary doctrine and its interplay with product liability law in Tennessee. And the court noted the key inquiry in every one of these cases involving learned intermediary doctrine is whether additional warnings, if given, would have prevented the patient from being injured. That's the key question. So the fact question, the proof question, is how do you prove that? How do you get that into evidence? What the court said in that case was this was a case involving Neurontin, a drug named Neurontin. A Dr. Mackey prescribed Neurontin to this gentleman, Mr. Smith. Mr. Smith takes the drug and ultimately commits suicide, allegedly because the drug interfered with his mental processes. Dr. Mackey finds out that suicide is, in fact, a risk associated with the use of Neurontin. Dr. Mackey is deposed in the case. Dr. Mackey is asked precisely, Dr. Mackey, would you still prescribe Neurontin to Mr. Smith based on everything you know, even the risk of suicide? Yes, sir, I would. But I would warn Mr. Smith about the risk of suicide. Pfizer said that's not enough. Pfizer said you can't prove that would make any difference. And in the Smith case, Judge Trauger said, no, if there is evidence that the patient would not have taken the drug after being given the warning, that changes the outcome. And it's up to the jury to decide whether they believe that that would change the outcome. But that is enough to get past summary judgment, which is all we're talking about here. You're out of time, unless you want to take some time from your rebuttal. I do not, Your Honor. I think I've said my piece. Okay. May it please the Court, Your Honors. Eric Lasker on behalf of Novartis Pharmaceutical Corporation. The issue before the Court today is whether the District Court abused its discretion in disregarding a speculative summary judgment affidavit from the plaintiff in which she stated she would not have taken the prescription drug that was prescribed by her physician if she was warned of the risk. Well, the problem is that the plaintiff had submitted this affidavit saying that she would not have taken the drug if she had known about this warning. And since we're on summary judgment, that representation should have been construed in favor of the plaintiff. I'm having trouble finding why the District Judge undertook to decide that himself. Because you're under Rule 56-C-4, an affidavit needs to be based upon personal knowledge. It cannot be based on speculation. And as this Court held in Elrira-Lorraine and also in Nye v. CSX Corporation, a hypothetical statement by a witness as to what they would have done in a situation that's different than it was, whether they would have reacted to a warning in the past in a certain way, that's a hypothetical question and it's speculation. That's not personal knowledge. Now, there are other types of evidence that a plaintiff might be able to present in this case. For example, a plaintiff could present testimony that during the time that she was treated, she questioned her doctor about side effects of prescription drugs. In this case, actually, the testimony is to the contrary. In the record at 55-1, at page 6156-57, Ms. Payne testified she didn't question her doctor about side effects of prescription drugs or these drugs in particular. A patient or plaintiff could testify that you have a history here of not taking certain drugs when I find out about side effects. In this case, though, Ms. Payne testified to the contrary. She took every drug. The problem is all that could have been presented to the jury. The patient says, if I had known, if I was warned and I knew or thought there was a possibility I could experience this job death or however this serious condition might be described, and I know my health and what I would do better than anyone, I just don't see why the jury couldn't decide if that was too speculative or if they believed her or didn't believe her. Why should the judge get to decide that? Well, the issue, Your Honor, under Briggs v. Potter, for example, which is another opinion by this court, the court recognized that a district court has the discretion to disregard an affidavit that is submitted in support or in opposition of a summary judgment motion if it is based upon speculation. And again, under this court's precedent, in Elira v. Lorraine, in Nye v. CSX Transportation, as well as the other Federal Circuit Court cases that we've cited, the district court acted well within its discretion in determining that this was purely speculative. Don't we get to look here at how Tennessee law views this? I'm thinking of the Ash v. Radiation Oncology Associates. That's a failure to disclose, but the Tennessee courts have been very clear in that, that it's the finder of fact that must consider and give weight to the patient's testimony quotation as to whether the patient would have consented to the procedure upon full disclosure of the risks. How is this failure to warn case any different from that? Well, there are two responses. First of all, in the Ash case, the court was also very clear that a plaintiff's testimony alone would not be sufficient as a matter of law. That was, in fact, the issue in the case. The court held that you need to have objective basis as opposed to just the plaintiff's testimony as a matter of law to be able to make an informed consent case, exactly for the reason that an after-the-fact testimony after an injury took place is too speculative to hang your hat on solely. Second in that case, that was an informed consent case, as Your Honor noted, and there is a heightened duty between a physician and a patient recognized as a matter of statutory law in that context. That does not apply in the case of pharmaceutical manufacturer prescription drug liability. In fact, as the Tennessee Supreme Court has held in Nye v. Baer crop science and also in Pittman v. Upjohn, in prescription drug product liability litigation, the duty is owed to the physician, not to the patient. When the physician is standing in the shoes because you've made that balance, who's it going to be, the manufacturer or the doctor? States get to kind of pick how that balance works. And when what the state says is that your duty is owed to provide the information to the doctor, then the doctor is the one that has to make that information known to the patient. So why don't you have the same flow requirement there that the response of the patient still matters? Actually, Your Honor, I would respond this way. Under their learned intermediary doctrine, what the Tennessee courts have held is that it is the physician who balances the risks and benefits of a prescription drug. And it is because of the fact that a prescription drug is treated differently than an over-the-counter drug. In fact, in the Pittman case, the court actually has a section discussing the fact there's different laws for prescription drugs and for over-the-counter drugs. For over-the-counter drugs, the law looks to how a warning is going to impact the patient. But with a prescription drug, the law is different. And the courts have recognized that and said, no, you look at how the warning would affect the physician. In this case, it's undisputed, and the plaintiffs acknowledge it in their brief, that Dr. Johnson would still have prescribed the drugs. That's at page 9 of their brief. There's no question about what the physician's risk-benefit analysis was. Under learned intermediary, the whole point of that doctrine is that you look at the impact of the warning on the physician. And then the question becomes whether he or she changes behavior. Well, no. The second step of it? Well, yes, Your Honor, but what behavior is being changed? And here the issue is, would he have continued to prescribe the drug? It's undisputed that he would have. Now, isn't the issue whether he would have prescribed the drug differently in a way that would have availed the plaintiff of the opportunity with knowledge to have refused it? No, Your Honor. I would say there's two issues here. Again, first of all, with respect to this case, whether or not there is any admissible or whether the judge's court acted within its discretion in determining there wasn't evidence, non-speculative evidence about what the patient would have done. But then the second question is, what type of change in behavior would have been relevant? With respect to, for example, the Smith v. Pfizer case that my colleague talked about, a very different fact pattern in that case. What happened in that case was that the physician would have told the patient, listen, there are some warning signals here. If you start having depression, if you have suicidal thoughts, I want you to come back to me because then we can do something to change your behavior, change your medical treatment. Now, that is exactly the situation that arises in ready-as-a-meta cases when it is a case of a dental issue that gives rise to the O and J, when there is a dental extraction. In that case, if the physician has warned the patient, listen, be aware of dental issues. When they arise, come to me and we can deal with it. Then if that happens, the patient can take action, the physician can take action. In fact, in this case, it's clear that that is what happened. The physician, and just to give us a clear timeline here, the patient's O and J did not manifest until 2007. What happened in 2005 was that the patient needed dental extraction. The physician, because he was aware of the fact that there was this association, and it went on the label, Your Honor, in 2003, there was a dear doctor letter sent out in 2004 advising physicians about the association between dental extractions and O and J. What would have happened there is, well, what happened in this case was he went on a drug holiday. Dr. Johnson said, You need a dental extraction? I'm putting you on a drug holiday. The doctor did not take her off the drug because of that. If you look at the record, and it's very clear, actually. There's a question also related to whether he would have had all his patients who would go on the drugs see a dentist and have any dental work that might be needed done in advance before beginning. That's exactly correct, Your Honor. If this was a case in which the O and J was precipitated by some sort of dental procedure that could have been avoided by that, then that would have been an approximate causal chain the plaintiff could make in this case. But here, the plaintiff's expert stated that her O and J was spontaneous. It was not precipitated by any dental extraction. Therefore, another one of their experts also acknowledged, in this case, under these facts, and it distinguishes this case from the other cases in the O and J litigation that have gone this way, and there's been a lot of cases on both sides because of individual facts. In this case, any warning about a dental screening or about being careful about your dental treatment is irrelevant. It has no connection, no proximate causation connection to the patient's injury. The first event that occurred here is the manifestation of the injury in 2007. So the only action that could have been a proximate cause in this case was a decision at the outset not to take the drug. My colleague acknowledges they're saying that that would have been in 2003. Ms. Payne started taking the drug in 1999. So the theory that they're presenting in this case is that if the doctor had known in 2003, 4 years after she had already been taking the drug and received a warning, she would have at that point said no more. Now there's no testimony in this case, no evidence that's been presented in any event, that 4 years of taking the drug as opposed to 5 years of taking the drug would have changed the outcome a few years later. So your position is that this case rises and falls on the speculative nature of the plaintiff's affidavit? Well, two points, Your Honor. Yes, it does rise and fall on whether or not the district court acted within its discretion under Briggs v. Potter, and in light of Eliral, Lorraine, and Nye v. CSX and the other court cases, to disregard the affidavit as being entirely speculative. That is step one. But alternatively, and the court doesn't need to reach this if it determines that the district court acted within its discretion, but alternatively, under the learned intermediary doctrine, the issue is what the physician would have done, not what the patient would have done, whether the physician would have continued to prescribe the drug. And in this case, there's no question that, and no dispute, that the physician would have continued to prescribe the drug. Again, there's no other precipitating event. This isn't like the Smith v. Fizer case in which the patient had symptoms if this had been an extraction case, that some other step could have been taken. The only issue here is whether or not the patient would have taken the drug. And here it's undisputed now, I think, that the patient would have taken the drug for at least four years. And the question is whether or not the speculative affidavit means that last year or two she might not have taken the drug. We would assume that that was not competent evidence. Under 56C4, the district court acted within its discretion in disregarding it. But that's the only theory they've got now. And, Your Honor, also, with respect to the Smith v. Fizer case, it wasn't that the plaintiff in that case was presenting an after-the-fact statement wouldn't have been possible in that case, that he would not have taken the drug if he'd been warned. What happened in that case was there was objective evidence. He had contemporaneous evidence of the patient's practice. He went and talked to his brother-in-law, I think, who's a pharmacist, and was inquiring about side effects of the drug. So he had objective contemporaneous evidence, which, again, is directly contrary to the evidence here at R151-8 at 10411. This pain testified very clearly. She never refused any drug that Dr. Johnson prescribed to her. Remember, she was being treated for metastatic breast cancer, Your Honor. She had breast cancer that had spread to her ribs. It had spread to her spine. It had caused spinal compression, spinal fractures in two of her vertebrae. Aridians and meta were the only drugs available on the market that could treat those conditions. And, in fact, it's undisputed that they're extremely effective in doing that. Plaintiffs' own experts in this litigation have testified that these drugs prolong life, that they are very effective in avoiding bone destruction caused by cancer, and that they are, in fact, when their experts talk about the fact that it boxes the cancer into the bone. This court itself, the Sixth Circuit, in Simmons and in Thomas, have recognized that these are very effective drugs and the only drugs available to treat this condition. And that's why oncologists are continuing to prescribe these drugs today. It's why Dr. Johnson continues to prescribe these drugs routinely today. So what we're being... He asks that his patients now have a dental plan in place because he's now aware there's going to be jaw death. He's aware of that risk and, in fact, was aware of that very clearly during the treatment in this case. The fact that Dr. Johnson put Mrs. Payne on a drug holiday so that she'd get a dental extraction is conclusive evidence that he was aware of the risk of ONJ while she was being treated. He would not have put her on the drug holiday. That's the whole purpose of putting her on the drug holiday, is because you're aware that this is a possible risk. And he testified he had been aware of that for a year. Now, again, if you look at the medical records, his intent was... You disagree with your opposing counsel as to the knowledge of the doctor then? Well, Your Honor, I don't think there's any credible basis to claim anything differently. The doctor took her off the drug for dental extraction. If you look at the records, it's very clear also, and this is at the record 37-43 at 3657, the reason that she didn't go back on the drug had nothing to do with dental issues. It was a renal issue. It's a separate side effect that has nothing to do with the facts in this case. So there's no plausible explanation for why he would have taken her off the drug for a dental extraction unless he knew about the risks of ONJ. And even when he was doing that, if you look at that record, he states, we're going to give you your Zometa today. So even as he's taking her off the drug for a dental extraction in the future so that she could have this drug holiday, he's still giving her the drug that day because of the fact that this drug is so essential for patients like Ms. Payne who've had this cancer, who spread to their bones. Counselor, you're out of time. You probably want to wrap up there. Your Honor, so again, this is an issue of abusive discretion. District Court had the discretion under Briggs v. Potter to disregard the summary judgment affidavit as speculative, and we do not believe there's been any abusive discretion in this case. Thank you, Your Honor. Thank you. Your Honor, before I forget about this, my first rebuttal is from the Novartis. We have a fundamental disagreement about two facts here in this case. Dr. Johnson testified. He took Ms. Payne off Zometa in 2005. Quote, there was some data coming out about that time that Iridia and Zometa can be associated with osteonecrosis of the jaw. That's why he took her off. I don't understand why there's a factual difference when it's clear as a bell. The other difference is, Judge Stranch, Novartis is just wrong about what happened in Ashe. The Supreme Court in Ashe said, and you're right, it is a matter of Tennessee law, a plaintiff can testify whether or not she would take the treatment offered or prescribed by the physician. It is an objective standard that the jury decides whether a reasonable patient, under circumstances, would have agreed to the treatment. But the patient's decision is relevant. You don't have to have other evidence out there about what would happen or not happen. He's just wrong about that. There's even no statement in the Ashe case about there being so-called objective evidence. It's an objective jury standard. So your position is that there was or was not independent knowledge of the doctor about the problems with Zometa? Prior to 2005, there was not. There was not. The other issue, many, many times counsels expressed how good this drug is, how great it works, the fact that she may have been on for some time and whether or not that had anything to do with this. That's all great jury argument. That's all great material to be weighed by the trier of fact, not the district court. This was a jury issue. Judge Black's got this nailed down. The issue for the jury is whether they believe Ms. Payne would have stopped taking this drug. That's the question. And whether or not, from our position, the surgeon, Dr. Kraut, says it's the drug that caused the injury. The court, with respect, has to accept that as a fact for this appeal. The final issue I want to raise, I believe counsel for Novartis said that there was no case in this circuit or no case like the facts of this case in this circuit. I must respectfully disagree. I've mentioned the Schaeffer case before and I want to mention it again. It's out of the Southern District of Ohio. Schaeffer versus Novartis. Judge Rice went through an exhausting review of the MDL cases. And in that case, Ms. Schaeffer testified, I would not have taken Zometa if I had known that I would have jaw death. Novartis said that's not good enough, Judge Rice. That's speculative. And Judge Rice disagreed. Novartis cited Payne versus Novartis. The case that's on appeal right now, Judge Rice said, I respectfully disagree with the court's decision in Payne versus Novartis. Judge Rice agreed that the patient's testimony about whether or not she would take the drug is an admissible component of the chain of causation. That if she hadn't taken the drug, she wouldn't have been injured. If this court were to adopt Novartis' position, you'd be going against many decisions that the MDL court made. You'd basically be abrogating Judge Rice's decision at Schaeffer. Not only Schaeffer, Gunther versus Novartis, Georges versus Novartis, Fussman versus Novartis. I mean, this court, with respect, would be a rogue. And the reason that the court, in our view, should rule in our position is it follows a road map set by the MDL court and the clear decisions of other courts which found that this is Ms. Payne's affidavit and her testimony is admissible. And it's a jury question as to whether or not she's to be believed. Based on the foregoing, we respectfully request that you vacate this summary judgment and send it back to the Eastern District of Chattanooga for trial. Thank you. Thank you, and the case is submitted.